# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: FEBRUARY 19, 2026
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

## 2024-SC-0345-MR

JASON TURNER                                              APPELLANT

V.                 ON APPEAL FROM KENTON CIRCUIT COURT
HONORABLE PATRICIA M. SUMME, JUDGE
NO. 22-CR-00581

COMMONWEALTH OF KENTUCKY                    APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING IN PART, REVERSING IN PART, AND REMANDING</u>**

This case is before the Court as a matter of right following the conviction of the Appellant, Jason Turner, for second-degree assault, first-degree criminal mischief, fourth-degree assault, aggravated driving under the influence, and first-degree persistent felony offender. He was sentenced to twenty years in prison. He now appeals arguing several claims of error.

First, he argues the trial court erred by failing to grant his motion of directed verdict pertaining to second-degree assault and first-degree criminal mischief; second, the trial court erred in refusing to allow him a continuance to retain private counsel; third, a violation of his Sixth Amendment confrontation rights when a representative from Nissan was not called to testify about information from the motor vehicle; fourth, the evidence of his intoxication through blood samples was erroneously admitted in violation of the statute;

fifth, improper evidence admitted in the penalty phase; and sixth, prosecutorial misconduct during the penalty phase. For the following reasons, we affirm in part and reverse in part. We remand for resentencing.

## I.    Facts

Jason Turner was celebrating the birthday of his daughter at his mother's home on Parker's Grove Road on March 26, 2021. The festive day was joined by several family and friends, including Turner's girlfriend at the time, Stephanie Robinson, and a childhood friend, Trevor Rigney. The party began around 5 p.m. in the evening. The three eventually left the party briefly to get cigarettes and alcohol. Robinson testified she saw Jason only drink half a can of beer prior to leaving, pouring the other half on the meat on the grill. Rigney testified he had not seen Jason drink at all prior to leaving.

The three drove to a gas station and a liquor store, as well as briefly stopping at Robinson's sister's house. Video camera footage from the gas station and liquor store record a 2007 Nissan Armada coming and going. Robinson testified the Armada was hers, but she shared it with Turner. It is undisputed that Turner was driving. Robinson testified she purchased the vehicle for $7,000. At the liquor store, Turner purchased a four-pack of Fireball Whiskey airplane shooters. He drank two of them, as two empty bottles were recovered at the scene along with two full bottles.

Driving back along Parker's Grove Road, a road Turner grew up on and was quite familiar with, the three approached a hill which, according to Robinson, gave one "butterflies" in their stomach if a vehicle were going

2

sufficiently fast to jump the hill. Robinson testified she never did this herself, but that Turner frequently did so. On this night as they approached the hill, Turner told his companions he would "hit this f***king hill harder than I've ever hit it." Data from the vehicle shows that Turner was travelling approximately 76 miles per hour in a 55 miles per hour zone when he jumped the hill. Turner perceived that he was going off the road, over-corrected, and crashed the vehicle into a tree.

Robinson and Rigney were ejected from the vehicle. Robinson sustained injuries that, if left untreated, would have been fatal. She broke six ribs, multiple bones in the pelvic ring, her nose, as well as multiple teeth. A lung was pierced and collapsed, and she also sustained a laceration to her liver and buttocks. She had to be airlifted to a hospital in Cincinnati. Rigney, who had inopportunely unbuckled himself to pick up some cigarettes moments before the crash, initially appeared lifeless to a neighbor who responded to the crash. When he did finally come to, he began walking aimlessly and repeating himself. Fortunately for him, his only significant injuries were a laceration to his head, a broken elbow, and an ankle injury. Turner, as is so often the outcome in these types of cases, was essentially unscathed.

Turner's conduct at the scene became an issue. Though Robinson was screaming in pain, Turner was described as "more upset than she was." Police would later put him on the ground and handcuff him because of his "aggressive" conduct with EMS. Later at the hospital, when police were seeking blood samples, Turner had to be restrained and was subsequently charged

with and convicted of disorderly conduct and resisting arrest. The first blood sample was extracted at 2:13 a.m., and the second at 3:15 a.m. The crash occurred at approximately 9:49 p.m. Dr. Gregory Davis testified that based on the blood alcohol content in the two samples, he could extrapolate Turner had a BAC of .133 at the time of the crash.

Prior to trial, Turner had moved to suppress this evidence under KRS[1] 189A.010(2)(a). That statutory provision generally prohibits blood tests taken more than two hours after cessation of the operation of the motor vehicle if the prosecution is based on KRS 189A.010(1)(a) or (f) but does not apply if the prosecution is based on KRS 189A.010(1)(b), (c), or (e). The Commonwealth represented to the trial court that its prosecution was based on these exempted provisions, therefore, the statute did not compel a finding of inadmissibility for the blood samples. The trial court agreed and allowed them in.

Also prior to trial, which occurred on June 12, 2024, Turner filed a *pro se* motion for continuance to retain private counsel. This motion was filed on May 29, 2024. Turner's appointed counsel informed the trial court the motion was filed against her advice and that she was prepared for trial. Turner informed the trial court that he was not trying to make anyone angry, but that he did not feel he had been adequately represented. He specifically noted that he had not seen expert witness evidence regarding the motor vehicle data. The trial court denied the motion. Important to our analysis in this issue, it must be noted that Turner acknowledged he needed to work to afford private counsel

---

[1] Kentucky Revised Statutes.

and did not presently have the estimated $5,000 needed to retain private counsel. Thus, Turner was simultaneously requesting amendment of his bond conditions so that he could find work. But only two weeks prior to his motion, Turner had been charged in Graves County with four offenses. The Commonwealth was in fact seeking to revoke Turner's bond at the same time he wanted the trial court to amend his bond to be able to afford private counsel.

During the tree-day trial, Detective Aaron Schihl of the Serious Accident Reconstruction Team testified regarding the nature of the crash and how it occurred. Det. Schihl is trained on the Bosch CDR event-data recorder, essentially the equivalent of a "black box" for motor vehicles. The 2007 Nissan Armada, however, pre-dated this system. Det. Schihl had to work with a Nissan representative to extract the data. The difference between the two is that the Bosch system creates a downloadable PDF file, while the system in Robinson's vehicle created a "ticker-tape" style print out. Turner did not object to this at trial, but now asserts the representative from Nissan who assisted Schihl in obtaining the data needed to testify under KRE[2] 901 to explain how the data was interpreted and as a custodian of record to establish authenticity. The Commonwealth responds that Det. Schihl's lack of knowledge only pertained to extracting the data from the system; he was perfectly competent to interpret the data itself and that the Nissan representative "did not perform any analytical function of any kind[.]"

---

[2] Kentucky Rules of Evidence.

At the conclusion of the Commonwealth's case-in-chief, Turner moved for directed verdicts regarding first-degree criminal mischief and second-degree assault. As to the former charge, Turner argues on appeal the Commonwealth failed to prove Turner's conduct was wanton; second, the Commonwealth failed to prove Turner did not have a right to the vehicle; and third, the Commonwealth failed to demonstrate more than $1,000 in damages. The Commonwealth responds that the latter two of these arguments were not presented to the trial court and, therefore, are unpreserved. Turner concedes this in his reply brief and requests palpable error review as to these arguments. As to second-degree assault, Turner similarly argues the Commonwealth failed to demonstrate wantonness.

Finally, in the penalty phase, the Commonwealth introduced evidence of three prior misdemeanor convictions. One, stemming from 2020, was a fourth-degree assault, domestic violence conviction. Through testimony, the Commonwealth elicited the name of the victim, Stephanie Robinson. The second conviction was for the second-degree disorderly conduct and resisting arrest stemming from the night of the accident. On direct testimony the Commonwealth elicited the date of this offense. Similarly, during closing arguments, the Commonwealth told the jury that this was not the first time Robinson had been assaulted by Turner; that she was, therefore, "one of the luckiest people in the world to now be walking away from that assault[,]" and "that the sentence he received the first time he assaulted her clearly wasn't enough." Turner objected to these statements as prosecutorial misconduct and

requested an admonition. The Commonwealth argued the defense had opened

the door by requesting leniency from the jury by pointing out the people in the

courtroom in support of Turner, including Robinson. The trial court agreed,

overruled the objection, and denied the admonition.

We now consider the merits, and additional facts will be elucidated as

needed.

## II. Analysis
## A. Partial Error in Denying Directed Verdict Motions

> The legal standards for a directed verdict motion are clear: "'if
> under the evidence as a whole it would not be clearly unreasonable
> for a jury to find the defendant guilty, he is not entitled to a
> directed verdict of acquittal.'" *Trowel v. Commonwealth*, 550
> S.W.2d 530, 533 (Ky. 1977). "'The trial court must draw all fair and
> reasonable inferences from the evidence in favor of the party
> opposing the motion, and a directed verdict should not be given
> unless the evidence is insufficient to sustain a conviction. The
> evidence presented must be accepted as true. The credibility and
> the weight to be given the testimony are questions for the jury
> exclusively.'" *Commonwealth v. Sawhill*, 660 S.W.2d 3, 5 (Ky.
> 1983). The standard for appellate review is equally clear: "'on
> appellate review, the test of a directed verdict is, if under the
> evidence as a whole, it would be clearly unreasonable for a jury to
> find guilt, only then the defendant is entitled to a directed verdict
> of acquittal.'" *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky.
> 1991).

*Eversole v. Commonwealth*, 600 S.W.3d 209, 217-18 (Ky. 2020). "We construe

all evidence below in a light most favorable to the Commonwealth."

*Commonwealth v. Jones*, 497 S.W.3d 222, 225 (Ky. 2016).

The preserved argument for both first-degree criminal mischief and

second-degree assault is the alleged failure to demonstrate wanton conduct.

Turner concedes his conduct could be seen as reckless but insists he was

familiar with Parker's Grove Road and the testimony supported that he had "jumped" the hill routinely over the years. Accordingly, argues Turner, the evidence supported that he did not perceive the risk, and could not be convicted of wanton conduct.

A conviction for second-degree assault is justified when a person "wantonly causes serious physical injury to another person by means of a deadly weapon or a dangerous instrument." KRS 508.020(1)(c). This statute does not define wanton specifically, so we refer to KRS 501.020(3) for the general definition:

> A person acts wantonly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person who creates such a risk but is unaware thereof solely by reason of voluntary intoxication also acts wantonly with respect thereto.

One error of Turner's reasoning is immediately apparent: he insists on a subjective test for wantonness in that because he was familiar with the road and had jumped the hill numerous times in the past, he could not be held to have acted wantonly. The statute, however, creates an objective test from the perspective of "a reasonable person . . . in the situation." *Id.* We agree with the Commonwealth that driving twenty miles per hour over the speed limit on a hill in order to make a vehicle airborne does present a substantial and

8

unjustifiable risk to an objectively reasonable person that one could lose control of the vehicle and crash.

Secondly, Turner argued below that his conduct did not manifest an extreme indifference to human life. That language, however, is not in the relevant statute. First-degree assault requires extreme indifference to human life. KRS 508.010(1)(b). Its absence is a key distinguishing element between first- and second-degree assault. Therefore, even assuming Turner is correct that his conduct did not establish extreme indifference to human life, it is irrelevant to a second-degree assault charge.

Finally, and dispositively, the evidence for intoxication was sufficient to demonstrate wantonness. Dr. Gregory Davis testified that based on the blood alcohol content in the two samples, he could extrapolate that Turner had a BAC of .133 at the time of the crash. It is undisputed that Turner was driving, and it is equally undisputed that his conduct was the cause of the crash. Turner concedes this by acknowledging his conduct could be characterized as reckless. Although Turner challenges the blood sample testimony, we "consider in determining whether or not the evidence was sufficient to support a given point . . . the *same* evidence considered by the trial court, rightfully or wrongfully." *Burton v. Commonwealth*, 300 S.W.3d 126, 144 (Ky. 2009). In *Burton*, we affirmed a denial of directed verdict for second-degree assault because the evidence was sufficient to show the defendant was intoxicated and caused the collision. *Id.*

Similarly, in *Burchett v. Commonwealth*, we held "[o]ne way to prove wantonness is to show that the defendant in a vehicle-homicide case was driving while intoxicated." 98 S.W.3d 492, 494 (Ky. 2003). Although *Burchett* involved a second-degree manslaughter charge, the case is analogous as second-degree assault and second-degree manslaughter both require a wanton state of mind and neither require extreme indifference to human life. KRS 507.040(1) (defining second-degree manslaughter); *Hudson v. Commonwealth*, 385 S.W.3d 411, 417 (Ky. 2012) (explaining difference between wanton murder and second-degree manslaughter is the absence of extreme indifference to human life). Thus, a directed verdict on the basis that the Commonwealth had not sufficiently demonstrated wantonness was not warranted and the trial correctly denied the motion.[3]

As to the unpreserved arguments regarding first-degree criminal mischief that the Commonwealth did not demonstrate Turner had no property interest in the Nissan Armada and that there was insufficient evidence to demonstrate more than $1,000 in damages, we are unpersuaded as to the first argument but agree with the second.[4] Palpable error focuses on manifest injustice and to find that

---

[3] To spare unnecessary ink, this ruling also includes the argument pertaining to first-degree criminal mischief which also requires a wanton state of mind. KRS 512.020(1).

[4] KRS 512.020(1) was amended in 2024 to decrease the threshold sum to $500 or more. KRS 512.020(1)(a), KY LEGIS 174 (2024), 2024 Kentucky Laws Ch. 174 (HB 5).

we "must plumb the depths of the proceeding" to discover whether "the defect is so manifest, fundamental and unambiguous that it threatens the integrity of the judicial process." *Martin v. Commonwealth*, 207 S.W.3d 1, 4-5 (Ky. 2006). "A palpable error must be so grave in nature that if it were uncorrected, it would seriously affect the fairness of the proceedings." *Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky. 2006). The essential question is whether a "substantial possibility" exists that "the result in the case would have been different without the error." *Id.*

*Johnson v. Commonwealth*, 680 S.W.3d 814, 824 (Ky. 2023).

The Commonwealth was not required to submit into evidence the title to the Nissan Armada to demonstrate ownership as this is not a property dispute case. Robinson's testimony was sufficient to establish ownership, and she testified that she purchased the vehicle and that she shared it with Turner. Turner's use of his girlfriend's vehicle is not enough to raise an inference of mutual ownership.

As to the damage calculation, Robinson testified she purchased the vehicle for $7,000 (but there is no evidence for when the purchase was made) and the crash had totaled the vehicle. The Commonwealth notes that "[w]e have held that the testimony of the owner of stolen property is competent evidence as to the value of the property." *Commonwealth v. Reed*, 57 S.W.3d 269, 271 (Ky. 2001). This is true. But *Reed* is not the last word. In a much more recent case, we held that an owner of property is qualified to testify as to the value of that property but "his testimony must be supported by facts and

11

circumstances providing some minimal indicum of reliability beyond mere allegation." *Commonwealth v. McMichael*, 671 S.W.3d 30, 34 (Ky. 2023).[5]

In *McMichael*, the owner of a diner testified that he purchased said diner for approximately $25,000 and could potentially sell it for $30,000-$60,000. *Id.* at 31. There was no proof beyond his own assertions for these valuations. *Id.* The value of the actual stolen goods, stainless-steel siding, was estimated at $3,000, again without any support except the owner's assertion. *Id.* The underlying indictment for theft by unlawful taking included the $3,000 sum. *Id.* The owner had hired a contracting company who estimated the cost of repair for the stolen goods would be $62,493. *Id.* The trial court agreed to impose that amount as restitution. *Id.*

The Court of Appeals reversed. *Id.* at 32. The central issue on appeal before this Court was whether the Court of Appeals had ignored precedent holding the testimony of an owner of property is sufficient to establish the value of stolen or damaged property. *Id.* We quoted at length an old opinion which, pertinently, held that evidence of purchase price is insufficient to

---

[5] *McMichael* speaks in the context of a restitution hearing because the defendant pled guilty to the substantive act of theft by unlawful taking and agreed to pay restitution but disputed the value of that restitution. *Id.* at 31. There is, however, no logical reason to limit *McMichael* only to restitution hearings. If anything, that supports our conclusion here because the standard in *McMichael* was a preponderance of the evidence, while in Turner's case below he was subject to a beyond a reasonable doubt standard. Also, of the four principal cases we relied upon in the *McMichael* decision—*Allen v. Commonwealth,* 146 S.W. 762, 762-63 (Ky. 1912), *Poteet v. Commonwealth,* 556 S.W.2d 893, 896 (Ky. 1977), *Mitchell v. Commonwealth,* 538 S.W.3d 326 (Ky. App. 2017), and *Brewer v. Commonwealth,* 632 S.W.2d 456 (Ky. App. 1982)—only *Mitchell* occurred in a similar restitution hearing; the other three were direct appeals from a full jury trial.

establish value at the time property was damaged or stolen. *Id.* (quoting *Allen v. Commonwealth*, 146 S.W. 762, 762-63 (Ky. 1912)). Since the stainless-steel siding appeared to have no market value, or at least none was shown, evidence had to be established from competent witnesses. The only witness for the Commonwealth, however, was the owner though "no evidence of his qualifications to testify as to the diner's worth, beyond merely being its owner, was presented." *Id.* at 33. The Court of Appeals concluded the owner

> offered nothing more than his mere opinion of the worth of both the metal and the diner. There was no evidence of the current value of the diner or of the stainless steel at the time it was taken. This is simply insufficiently detailed or reliable to establish a fair restitution computation; due process requires more.

*Id.* We affirmed this holding. *Id.* In support, we highlighted several cases demonstrating that while an owner of property is qualified to testify, something more than opinion must be presented to support the owner's assessment of value. For example, we cited the case of *Poteet v. Commonwealth*, 556 S.W.2d 893, 896 (Ky. 1977) where the owner established the value of an item in the form of an insurance claim. *McMichael*, 671 S.W.3d at 34. We also cited *Mitchell v. Commonwealth*, 538 S.W.3d 326, 328 (Ky. App. 2017) where the owner of jewelry established her valuations by reference to listed prices on Amazon.com. *McMichael*, 671 S.W.3d at 35.

Consequently, we must agree with Turner that the Commonwealth has not established the value of the Nissan Armada at the time of the crash. Robinson offered no testimony or other evidence as to the value of the vehicle at the time of the crash. The Commonwealth concedes this. Instead, it argues

13

for the inference based on Robinson's testimony as to purchase price. But "[e]vidence of the cost price of an article is not conclusive as to its value[.]" *Id.* at 32 (quoting *Allen*, 146 S.W. at 763) (emphasis removed). There was nothing to support that the estimated value of the vehicle at the time of crash was more than $1,000. Owners of property are competent to testify as to the value of their property, but that testimony must be accompanied by "some minimal indicum of reliability beyond mere allegation." *Id.* at 36. That standard was not met below.

Accordingly, there is a failure of proof in the Commonwealth's case. "A conviction based on insufficient evidence necessarily results in manifest injustice." *Martin v. Commonwealth*, 686 S.W.3d 77, 99 (Ky. 2023). To uphold a conviction without an essential element being proven is a fundamental and unambiguous threat to the judicial process, and if uncorrected would seriously undermine the fairness of judicial proceedings. *Johnson*, 680 S.W.3d at 824. Had this been brought to the trial court's attention a substantial possibility of a different result exists and the motion for directed verdict regarding first-degree criminal mischief would likely have been granted. We conclude a palpable error occurred and reverse Turner's conviction for that offense.[6]

---

[6] Given our rationale, remand is unnecessary since a retrial on this charge is constitutionally barred. "Generally, the double jeopardy clause does not bar retrial after reversal of a criminal conviction. But retrial is barred if an appellate court has found there was insufficient evidence to support the conviction." *Cohron v. Commonwealth*, 306 S.W.3d 489, 497 (Ky. 2010) (internal citation omitted).

14

### B. No Abuse of Discretion in Denying Continuance

The trial court's decision to deny Turner's motion is presented on appeal as a denial of a motion to withdraw counsel, but it substantively required a continuance of trial and an amendment of bond conditions as well. All three decisions are within the discretion of the trial court. *Deno v. Commonwealth*, 177 S.W.3d 753, 759 (Ky. 2005) (standard of review for motions to substitute counsel); *McCoy v. Commonwealth*, 553 S.W.3d 816, 820 (Ky. 2018) (standard for review of motions to continue trial); *Abraham v. Commonwealth*, 565 S.W.2d 152, 154-55 (Ky. 1977) (standard of review for setting bond conditions).[7]

Based on the factual recitation in Part I we find no abuse of discretion. A motion to substitute counsel "is a high bar and there must be good cause for removal." *Henderson v. Commonwealth*, 563 S.W.3d 651, 669 (Ky. 2018). We find nothing in Turner's case beyond the mere generalized grievances that we have heretofore found insufficient. *See, e.g., Stinnett v. Commonwealth*, 364 S.W.3d 70, 81 (Ky. 2011). Moreover, because Turner's motion essentially required an amendment of bond conditions so that he could work and raise funds to hire a private attorney, which he admitted at the hearing he could not presently do, the trial court was unlikely to allow such amendment in light of Turner's new charges in Graves County for which the Commonwealth was presently seeking a revocation of bond.

---

[7] Our decision in *Abraham* followed *Stack v. Boyle*, 342 U.S. 1, 6-7 (1951), that there is no discretion to refuse to amend excessive bail conditions. There is no argument on appeal that Turner's bond conditions were excessive therefore, this is not a constitutional question and the abuse of discretion standard is appropriate.

### C. No Palpable Error in Motor Vehicle Data Testimony

Under KRE 901, "[w]hether there is enough evidence of authenticity to admit evidence is within the discretion of the trial court." *Brafman v. Commonwealth*, 612 S.W.3d 850, 866 (Ky. 2020). Turner argues there was insufficient evidence of authenticity as he alleges Det. Schihl was not qualified to interpret the crash data from the Nissan Armada since a Nissan representative had to assist in extracting the data. He also insists the Nissan representative had to testify as the custodian of records. We disagree.

Det. Schihl represented that he was competent to interpret the data from the Nissan but was unfamiliar with how to extract that data from its system. The Commonwealth asserts the Nissan representative did not perform or aid in any analytical function and Turner has not shown any evidence to the contrary. At worst, he points to testimony from Det. Schihl who stated,

> [W]e were able to piece together with the collision, they went over the rise in the roadway. The vehicle, or at least some of the vehicle tires, got airborne and the operator then perceived he was at the edge of the roadway, as we saw in the tire marks, and as is very common, overreacted with a hard steering input to the left.

Turner argues the plural "we" in Det. Schihl's statement "seemed to be testifying as to conclusions made in conversations with the Nissan representative." We disagree. The plural "we" could just as well have been a reference to Det. Schihl's colleagues on the Serious Traffic Accident Reconstruction team. Secondly, Turner does not point to any indication that the Nissan representative was ever the sole custodian of the vehicle data, and Det. Schihl's testimony indicates that the representative "came out" and

16

extracted the data while police were in overall custody of the vehicle. Finally, the Commonwealth correctly points out that Turner has not demonstrated he was challenging the fact that he was speeding. He concedes on appeal that his conduct was reckless and defense counsel at trial conceded in closing that Turner was speeding.

### D. No Error in Admitting Blood Sample Evidence

A motion to suppress is reviewed by appellate courts under a two-prong test: we review factual determinations for clear error and review the application of law to the facts *de novo. Cox v. Commonwealth*, 641 S.W.3d 101, 113 (Ky. 2022). As stated in Section I, KRS 189A.010(2)(a) generally prohibits blood tests taken more than two hours after cessation of the operation of the motor vehicle if the prosecution is based on KRS 189A.010(1)(a) or (f) but does not apply if the prosecution is based on KRS 189A.010(1)(b), (c), or (e). The trial court agreed with the Commonwealth that its prosecution was based on the exempted provisions and allowed Dr. Gregory Davis' testimony. Dr. Davis testified he could extrapolate Turner's level of blood alcohol content at the time of the crash to be .133 based on blood samples taken beyond two hours after the crash. He also testified to inactive marijuana particulates in Turner's blood meaning that Turner had likely ingested marijuana a day before the crash, but this did not contribute to his intoxication at the time of the crash.

17

Accordingly, Turner argues the Commonwealth could not be prosecuting him under KRS 189A.010(1)(c)[8] or (e).[9] We agree with Turner that because the Commonwealth would have known prior to trial the substance of Dr. Davis' conclusions that the marijuana found in Turner's blood did not contribute to his intoxication at the time of the crash, a prosecution based on a combination of substances under KRS 189A.010(1)(c) or (e) would not have authorized the admissibility of the blood samples as evidence. Nonetheless, KRS 189A.010(1)(b) states, "[a] person shall not operate or be in physical control of a motor vehicle anywhere in this state . . . [w]hile under the influence of alcohol[.]" The statute unambiguously declares, "[t]he results of the [blood sample] test or tests, however, may be admissible in a prosecution under subsection (1)(b) or (e) of this section[.]" The evidence was admissible under the statute therefore, the trial court did not err and the motion to suppress was correctly denied.

### E. Error in the Penalty Phase

This issue concerns the truth-in-sentencing statute, KRS 532.055(2)(a) and "the nature of prior offenses" that juries may informed of. In *Mullikan v. Commonwealth*, we recognized "by our previous struggles with this issue, that

---

[8] "A person shall not operate or be in physical control of a motor vehicle anywhere in this state . . . While under the influence of any other substance or combination of substances which impairs one's driving ability[.]"

[9] "A person shall not operate or be in physical control of a motor vehicle anywhere in this state . . . While under the combined influence of alcohol and any other substance which impairs one's driving ability[.]"

trial judges and prosecutors are in desperate need of a bright line rule." 341

S.W.3d 99, 109 (Ky. 2011). *Mullikan*, therefore, endeavored to lay down such a

rule. We stated,

> the evidence of prior convictions is limited to conveying to the jury
> the elements of the crimes previously committed. We suggest this
> be done either by a reading of the instruction of such crime from
> an acceptable form book or directly from the Kentucky Revised
> Statute itself. Said recitation for the jury's benefit, we feel, is best
> left to the judge. The description of the elements of the prior
> offense may need to be customized to fit the particulars of the
> crime, i.e., the burglary was of a building as opposed to a dwelling.
> The trial court should avoid identifiers, such as naming of victims,
> which might trigger memories of jurors who may—especially in
> rural areas—have prior knowledge about the crimes.

*Id.* At trial below, the Commonwealth prompted information regarding a

previous conviction for fourth-degree assault, domestic violence and specifically

disclosed through testimony the name of the victim, Stephanie Robinson. The

Commonwealth also educed the date of a prior conviction for resisting arrest

and second-degree disorderly conduct to show the underlying conduct

occurred on the night of the crash. Turner argues *Mullikan*'s stricture on

admitting victims' names was violated, and cites *Stansbury v. Commonwealth*,

454 S.W.3d 293 (Ky. 2015) in support, where we concluded disclosing the

victims' names on two of three charges was palpable error. *Id.* at 304-05.

Turner also argues eliciting the date of the underlying conduct in his second

conviction went beyond the scope of the element of the crimes in violation of

*Mullikan.*

The Commonwealth responds that *Mullikan*'s prohibition on naming

victims was out of concern that jurors may know the victim and thus be

unduly influenced. There is, however, no evidence of that occurring here as the jury was asked if they knew Stephanie Robinson during *voir dire* since she was a principal victim in the underlying case. Moreover, the Commonwealth asserts its eliciting this information was in response to defense counsel's argument in closing that Turner would not "consciously disregard something that would put Ms. Robinson at the risk of death[,]" and that Turner was not intoxicated the night of the crash because he cooperated with authorities.

We disagree with the Commonwealth. First, as we have often stated, arguments are not evidence. The Commonwealth was essentially arguing for curative admissibility by relying upon defense counsel's statements in closing argument to admit substantive evidence that is generally prohibited, *i.e.*, the names of the victims. We have specifically held the doctrine of curative admissibility is not applicable when seeking to redress statements in closing arguments. *Walker v. Commonwealth*, 288 S.W.3d 729, 741 (Ky. 2009). Moreover, in this case and under these facts, the fourth-degree assault conviction is not a proper rebuttal to an assertion that Turner would never place Robinson at risk of death since there was no explanation of the underlying facts in the previous case to explain how the prior conviction demonstrated he had placed Robinson at risk of death; indeed, there could not have been under the truth-in-sentencing statute. *Mullikan*, 341 S.W.3d at 109

("evidence of prior convictions is limited to conveying to the jury the elements of the crimes previously committed.").[10]

Fourth degree assault only requires physical injury to another person. KRS 508.030(1). Physical injury is defined as "substantial physical pain or any impairment of physical condition[.]" KRS 500.080(17). It is contrasted with "serious physical injury" which does include "a substantial risk of death[.]" *Id.* at (19). Assault in the first degree and second degree require serious physical injury. KRS 508.010(1); KRS 508.020(1). Therefore, in this case, the conviction for fourth degree assault does not in and of itself demonstrate that Turner had previously placed Robinson at risk of death, and is not proper evidence to rebut the assertion even if curative admissibility was appropriate.

Finally, in *Stansbury*, we held the naming of victims was palpable error and that the prohibition upon introducing victims' names was supported by "good, clear, published case law wherein we have repeatedly advised the Commonwealth to stop introducing the very type of evidence in question here." *Stansbury*, 454 S.W.3d at 304. Regardless of *Mullikan*'s explanation that naming victims may arouse improper memories of the jury, we do not read *Mullikan* as treating the issue exhaustively. *Mullikan* explicitly attempted to lay down a bright line rule for all cases. The Commonwealth's attempt to

---

[10] *Mullikan* adopted "a clear rule prohibiting the admission of factual details of prior crimes under Truth in Sentencing." *Mullikan*, 341 S.W.3d at 109. In other evidentiary contexts outside of the Truth-in-Sentencing paradigm, it is possible that the factual details underlying a fourth-degree assault conviction could rebut an assertion that a person did not place another person at risk of death.

distinguish *Mullikan*, that its prohibition only applies in the rare occasion that a juror might be familiar with a victim of a previous crime, only serves to cast shadows where we have sought to give light. We conclude the trial court erred in allowing this evidence to be heard.

As to the date of the underlying conduct in his conviction for disorderly conduct and resisting arrest, we are more circumspect. Once again, the doctrine of curative admissibility is not a good justification as relied upon by the Commonwealth below. The date of the underlying conduct is not an element of the crimes of disorderly conduct or resisting arrest, though dates could be a necessary element for other crimes. Additionally, it could be argued with some reason that including the date was an idiosyncratic customization "to fit the particulars of the crime[.]" *Mullikan*, 341 S.W.3d at 109. Because we find reversible error for the naming of Stephanie Robinson, which was the more egregious violation, we reserve judgment on this issue but we caution the Commonwealth on resentencing that the better way to rebut any assertion that Turner was cooperative with authorities is to rely on the testimony of EMS personnel and police officers present at the scene of the crash and at the blood draw who testified to their observations of Turner's conduct.

### F. Prosecutorial Misconduct Would be Insufficient for Reversal in Light of Other Evidence but it is Not Condoned

Because we are reversing the sentencing phase on the above error, we need not address this issue, but the statements made by the Commonwealth below compounded the error of naming Robinson as a previous victim and

22

therefore, merit some attention. Additionally, there is a possibility of recurrence on remand so addressing the issue is warranted. *See, e.g., Roberts v. Commonwealth*, 599 S.W.3d 841, 854 (Ky. 2020) (addressing issue likely to recur on remand); *Dunkleberger v. Commonwealth*, 719 S.W.3d 17, 30-32 (Ky. 2025) (addressing evidentiary issues because of potential for retrial).

> "Prosecutorial misconduct is 'a prosecutor's improper or illegal act involving an attempt to persuade the jury to wrongly convict a defendant or assess an unjustified punishment.'" *Commonwealth v. McGorman,* 489 S.W.3d 731, 741–742 (Ky. 2016) (quoting *Noakes v. Commonwealth,* 354 S.W.3d 116, 121 (Ky. 2011)). The misconduct can occur in a variety of forms, including improper closing argument. *Dickerson v. Commonwealth,* 485 S.W.3d 310, 329 (Ky. 2016) (citing *Duncan v. Commonwealth,* 322 S.W.3d 81, 87 (Ky. 2010)). In considering an allegation of prosecutorial misconduct, the Court must view that allegation in the context of the overall fairness of the trial. *McGorman,* 489 S.W.3d at 742. To justify reversal, the Commonwealth's misconduct must be "so serious as to render the entire trial fundamentally unfair." *Soto v. Commonwealth,* 139 S.W.3d 827, 873 (Ky. 2004) (quoting *Stopher v. Commonwealth,* 57 S.W.3d 787, 805 (Ky. 2001)).

*Murphy v. Commonwealth*, 509 S.W.3d 34, 49 (Ky. 2017). Our standard for preserved objections to prosecutorial misconduct has built in a harmless error analysis; thus, reversal is only warranted "if proof of the defendant's guilt was not such as to render the misconduct harmless, and if the trial court failed to cure the misconduct with a sufficient admonition to the jury." *Id.* (quoting *Duncan v. Commonwealth,* 322 S.W.3d 81, 87 (Ky. 2010)).

The issue is preserved here but we would not find reversal warranted given the weight of evidence as to Turner's guilt. That said, we are troubled by the Commonwealth's statements in closing. Turner's counsel had made statements to the effect that the jury should be lenient towards Turner because

23

of the support he had received throughout trial as evidenced by the number of people sitting on his side of the courtroom during trial, including Robinson. This was in spite of Robinson's testimony that she and Turner were no longer in a relationship and did not speak to one another. In response, the Commonwealth relied upon the prior conviction of fourth degree assault, domestic violence to argue,

> I certainly don't think that Mr. Turner meant to cause the serious physical injury that he did to Stephanie Robinson on March 26, but this is not the first time he's assaulted Stephanie Robinson. Because you heard about that misdemeanor conviction from 2020 of an assault in the fourth-degree, domestic violence against her, too. And so, Stephanie Robinson has to know by now that she is one of the luckiest people in the world to now be walking away from that assault. And I don't know what other assault it will take for Stephanie Robinson to maybe move to the other side of the courtroom.

Turner objected but the trial court overruled and allowed the Commonwealth to proceed. The Commonwealth then stated,

> I, too, have seen her sitting on the defendant's side of the courtroom. On the side of the courtroom of the person that she's trusted since she was a teenager. And the sentence that he received the first time he assaulted her clearly wasn't enough.

> Conceding the point that second degree assault and fourth degree

assault, domestic violence are both abstractly considered assaults, we cannot countenance the Commonwealth's unfair portrayal of the crash as merely one additional occurrence in a pattern of violence perpetrated by Turner upon Robinson. The Commonwealth's argument was an obvious attempt to link the two crimes and portray Turner as a serial abuser despite admitting there was no evidence to suggest Turner purposefully crashed the vehicle to intentionally

24

harm Robinson. The Commonwealth explicitly argued the jury should consider the alleged inadequacy of his sentence for fourth-degree assault, domestic violence when sentencing him for second-degree assault. We, therefore, conclude these statements were inflammatory. It is beyond cavil that the car crash at issue here and assault arising from domestic violence are categorically different things, involving different states of mind, vastly different circumstances, and involving various underlying psychological motivations that dispose one to commit domestic violence. The linking of the two crimes as evidence of a pattern of assault upon Robinson is not a legitimate inference justified by the facts. *Murphy*, 509 S.W.3d at 50.

Upon resentencing, the likelihood of the Commonwealth making a similar argument is substantially lessened by our prohibition upon naming Robinson as the victim in the fourth-degree assault, domestic violence conviction. It is not impossible, however, as the Commonwealth could still seek to portray the second-degree assault as simply one instance in a pattern of assault which, as explained, is not justified by the categorically different circumstances of the two crimes. We, therefore, admonish the Commonwealth not to make this line of argument again.

### III. Conclusion

For the aforementioned reasons, we reverse Turner's conviction for first-degree criminal mischief. All other convictions are affirmed. Finding error in the

25

sentencing phase, we reverse his sentence and remand to Kenton Circuit Court for a new sentencing phase.

All sitting. Lambert, C.J.; Bisig, Conley, Goodwine, and Nickell, JJ., concur. Keller and Thompson, JJ., concur in result only.

COUNSEL FOR APPELLANT:

Kayla D. Deatherage
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Matthew R. Krygiel
Assistant Attorney General